Randall T. Garteiser (TX State Bar No. 24038912)
  rgarteiser@ghiplaw.com
M. Scott Fuller (TX State Bar No. 24036607)
  sfuller@ghiplaw.com
René Vazquez (VA State Bar No. 41988)
  rvazquez@ghiplaw.com
GARTEISER HONEA
119 W Ferguson, Tyler, TX  75702
Tel:  (888) 908-4400

Attorneys for Plaintiff,
CELLSPIN SOFT INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

|  |  |
|---|---|
| CELLSPIN SOFT, INC., <br><br> Plaintiff, <br><br> v. <br><br> NIKE, INC., <br><br> Defendant. | Case No. 6:21-cv-803 <br><br> **ORIGINAL COMPLAINT FOR INFRINGEMENT OF U.S. PATENT NOS. 8,738,794, 8,892,752, AND 9,749,847[1]** <br><br> **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.  This is a patent infringement action to stop Defendant's infringement of United States Patent Nos. 8,738,794 entitled "Automatic Multimedia Upload for Publishing Data and Multimedia Content" (the "'794 patent"), 8,892,752 entitled "Automatic Multimedia Upload for Publishing Data and Multimedia Content" (the "'752 patent"), and 9,749,847 entitled "Automatic Multimedia Upload for Publishing Data and Multimedia Content" (the "'847 patent") (collectively, the "patents-in-suit").

## THE PARTIES

2.  Plaintiff, Cellspin Soft, Inc. ("Cellspin"), is a corporation with an office and place business at 1410 Mercy Street, Mountain View, California 94041.

3.  Upon information and belief, Defendant, Nike, Inc. ("Nike"), is a corporation organized and existing under the laws of the State of Oregon, with its principal place of business at One Bowerman Drive, Beaverton, Oregon 97005-6453.  It can be served via its Agent for Service of process, United Agent Group Inc., 5444 Westheimer #1000, Houston, Texas, 77056.  Nike is targeting citizens in the state of Texas to buy its products and employing controversial parent control measures, or lack thereof, in allowing purchases to be made on-line via linking Nike's Apps including, Nike Run Club, Nike Training Club, Nike's Adapt, with Nike.com, as indicated by Nike's CEO, "Membership has proven to be a compelling driver of repeat engagement and buying across digital and physical retail, Donahoe said, and the company now has more than 300 million Nike members. Growth in member demand outpaced total digital growth to hit a new record of $3 billion, supported by strong member engagement, average order value and buying frequency."[2]

## JURISDICTION AND VENUE

4.  This action arises under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 271, 281, 283, and 284. This Court has subject matter jurisdiction over this case for patent infringement, including pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.  Plaintiff is the assignee of the Patents-in-Suit with all right, title and interest to bring the claims herein comprising those for past and present infringement, including to recover damages therefor.

6.  The Court has personal jurisdiction over Nike, including because Nike has minimum contacts within the State of Texas; Nike has purposefully availed itself of the privileges of conducting business in the State of Texas; Nike regularly conducts business within the State

---

[2] As visited on August 3, 2021, https://consumergoods.com/nikes-record-quarter-fueled-300-million-members-and-their-consumer-insights.

of Texas; and Plaintiff's cause of action arises directly from Nike's business contacts and other activities in the State of Texas, including at least by virtue of Nike's infringing methods and products, which are at least practiced, made, used, offered for sale, and sold in the State of Texas. Nike is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the Texas Long Arm Statute, due at least to its continuous and systematic business contacts in Texas. Further, on information and belief, Nike is subject to the Court's specific jurisdiction, including because Nike has committed patent infringement in the State of Texas, including as detailed herein. In addition, Nike induces infringement of the patents-in-suit by customers and/or infringing users located in Texas. Further, on information and belief, Nike regularly conducts and/or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from goods and services provided to persons and/or entities in Texas.

7.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b), including because Nike has at least one regular and established place of business, including Nike Stores and/or Nike Outlet Stores, in this District and in Texas, and at least some of its infringement of the patent-in-suit occurs in this District and in Texas.

### THE PATENTS-IN-SUIT

8.  Plaintiff refers to and incorporates herein the allegations in the above paragraphs.

9.  The claims of the Patents-in-Suit, including the asserted claims, when viewed as a whole, including as an ordered combination, are not merely the recitation of well-understood, routine, or conventional technologies or components. The claimed inventions were not well-known, routine, or conventional at the time of the invention, over ten years ago, and represent specific improvements over the prior art and prior existing systems and methods.

10. At the time of the patented inventions, publishing captured data from a data capture device to a web service was cumbersome and inefficient.

11. At the time of the priority date of the Patents-in-Suit (December 2007), the same year the world's first prominent mobile "smartphone" was released, and 6 months before the

world's first prominent mobile "app store" (*see* History of the iPhone on Wikipedia at https://en.wikipedia.org/wiki/History_of_iPhone & App Store (iOS) on Wikipedia at https://en.wikipedia.org/wiki/App_Store_(iOS)), it was a cumbersome and time consuming process to use a data capture device to acquire data, send that data to a mobile device with an internet connection, and the mobile device to upload that wirelessly received data to a website, especially for large data such as pictures or video data.

12. The most common and practical way to transfer large data was to physically plug a data capture device into, or transfer a memory card from a data capture device to, a computer, upload the data on the capture device or memory card to the computer, and further upload the data from the computer to a web service. *See, e.g.*, '794 at 1:37-54. In the case of using a 2007 mobile phone, the software on both the data capture device and mobile phone that established a paired connection and potentially transferred large data was extremely under developed and not the intended or foreseeable use of the mobile phone. Further, HTTP transfers of data received over the paired wireless connection to web services was non-existent. Mobile phones of that time exclusively used SMS,[3] MMS,[4] or email-based communication methods (such as POP3 or IMAP[5] to transfer data that was acquired by the mobile phone. It was not until 2009 or later when the leading tech companies, such as Facebook and Google, started releasing HTTP APIs for developers to utilize a HTTP transfer protocol for mobile devices. *See* https://developers.facebook.com/docs/graph-api/changelog/archive; http://mashable.com/ 2009/05/19/twitter-share-images/#K9kEHwxammq0. Even in 2009 when Facebook and Google HTTP APIs were released, the released HTTP APIs were only used for data that was acquired by the mobile phone, and not for the data that was received wirelessly over the secure paired connection

---

[3] Short Message Service (SMS) is a text messaging service component of most telephone, World Wide Web, and mobile device systems. It uses standardized communication protocols to enable mobile devices to exchange short text messages. *See* https://en.wikipedia.org/wiki/SMS.
[4] Multimedia Messaging Service (MMS) is a standard way to send messages that include multimedia content to and from a mobile phone over a cellular network. *See* https://en.wikipedia.org/wiki/Multimedia_Messaging_Service.
[5] *See* https://en.wikipedia.org/wiki/Email#Types.

from a physically separate data capture device. Applying HTTP to a data in transit and on intermediary mobile device was not developed until the inventions of the Patents-in-Suit.

13. Including as of the priority date of the Patents-in-Suit, there have been many, albeit vastly inferior, means outside of the claimed invention for achieving the ends of acquiring and transferring data for publication, including on the Internet. For example, as noted in the specification,

> Typically, the user would capture an image using a digital camera or a video camera, store the image on a memory device of the digital camera, and transfer the image to a computing device such as a personal computer (PC). In order to transfer the image to the PC, the user would transfer the image off-line to the PC, use a cable such as a universal serial bus (USB) or a memory stick and plug the cable into the PC. The user would then manually upload the image onto a website which takes time and may be inconvenient for the user.

*See, e.g.*, '794/1:38-47. Another inferior method would be to have the capture device simply forward data to a mobile device as captured. This example is inferior including because, without a paired connection, there is no assurance that the mobile device is capable (*e.g.*, on and sufficiently near) of receiving the data. Such constant and inefficient broadcasting would quickly drain the battery of the capture device. Another inferior method for posting data from a capture device onto the Internet is to have a capture device with built in mobile wireless Internet, for example cellular, capability. As noted in the specification, "[t]he digital data capture device is physically separated from the BT enabled mobile device." *See, e.g.*, '794/2:2-3. This example is inferior including because, especially at the time of the patent priority date in 2007 but also today, it makes the combined apparatus bulky, expensive in terms of hardware, and expensive in terms of requiring a user to purchase an extra and/or separate cellular service for the data capture device.

14. Prior art methods for posting data from a data capture device onto the Internet were inferior. Back at the time of invention, capture devices such as cameras had only rudimentary wireless capabilities as exemplified by the U.S. Patent Application No. 2003/015,796 to Kennedy ("Kennedy") and ancillary prior art addressed extensively during prosecution of certain Patents-in-Suit and related patents. As noted by the inventors during prosecution of the '794 patent, in every day scenarios, the computer attaches a hypertext transfer protocol

(HTTP)_header and user ID to the data generated by the computer ("native data"), and the existing home wireless routers did not apply website user information or apply HTTP to the data sent over the wireless network from the computer to the home wireless router. However, the claimed invention improves and builds on this, including because the claimed mobile device is configured to send a HTTP request comprising the website user information and the non-native data, such that the mobile device is acting as more than just a normal home wireless router. According to the inventors, the wireless pairing established is therefore very important for the transfer of non-native data that is acquired by a physically separate device and then transferred to the mobile device over the trusted paired wireless connection.

15. Including at the time of the invention, data capture devices posed a number of specific challenges associated with publishing data to a web service from a capture device using a mobile device. The process to transfer new data from a data capture device to a web service was cumbersome and time consuming for the user. Further, data capture devices typically house small batteries, so users would be obligated to constantly charge batteries. The technology embodied in the Patents-in-Suit solved these, and other, problems. The claimed inventions comprise superior ways to achieve the ends of uploading data to the Internet via a mobile device. The claimed processes of the asserted claims seamlessly transfer data from a data capture device to a web service with little to no user intervention using a mobile device with a wireless internet connection as the center piece doing most of the heavy lifting. Making changes to the data in transit, at the mobile device, and not at the data capture device where the data originated from, results in a much-improved user experience making the process much easier on the user and improving data capture device battery life. The method of receiving the data at the mobile device, attaching user identifying information and HTTP methods to the data relieves the data capture device or web service of performing those steps which results in a seamless and improved user experience over the previous methods.

16. Among other things, the inventors of the Patents-in-Suit wanted to post onto the Internet content captured while a capture device, such a camera, was capturing data, for example photographs, in "real time" situations, for example, when the capture device was in

remote areas, adverse conditions or on the move. As noted in the specification, "[a] user may need to capture and publish data and multimedia content on the Internet in real time." *See, e.g.*, '794/1:37-38. As further noted in the specification, "there is a need for a method and system to utilize a digital data capture device in conjunction with a mobile device for automatically detecting capture of data and multimedia content, transferring the captured data and multimedia content to the mobile device, and publishing the data and multimedia content on one or more websites automatically or with minimal user intervention." *See, e.g.*, '794/1:48-54. But existing technology offered only unacceptably inferior solutions of posting to the Internet content captured from a capture device in "real time" situations.

17. The claims of the Patents-in-Suit are directed to specific improvements in computer and networking functionality and capabilities. Among other things, the claimed inventions improve functionality of data capture devices and methods, systems and networks comprising those devices. Including as noted in the Patents-in-Suit, the claimed technologies comprise innovative systems and processes which use less power than those existing at the time, and allow for multiple efficiencies resulting in a better user experience and reduced costs. The Patents-in-Suit thus provided concrete applications that improved computer and networking technology, including for publishing directly to a web service from a data capture device.

18. Additionally, the inventions of the asserted claims of the Patents-in-Suit comprise improvements in improving battery life on the data capture device, including that they reduce the processing done by the device and thus reduce battery consumption. Particularly applicable to wireless data capture devices small in size, such as petite fitness tracking devices, battery life plays a major role in the user experience. The Patents-in-Suit allow for a data capture device to be in a low power state to conserve battery life, and send an event notification to the mobile device to initiate a higher power consumption state during a brief communication period, and then revert back to the lower power consumption state. This saves a tremendous amount of power, including because the application on the mobile device, or the Bluetooth client, is charged with the majority of listening, rather than the data

capture device, or the Bluetooth server, which results in much better battery life for the data capture device, including since there is "[a] file event listener *in the client application* 203 [which] listens for the signal from the digital data capture device 201. '794 at 4:66-5:1 (emphasis added). Similarly, the Patents-in-Suit allow for a data capture device to be in a low power state to conserve battery life because in certain claimed embodiment the application on the mobile device with the internet connection, is charged with polling the data capture device for new data to transfer.

19. In sum, including as noted above, the claimed technologies of the Patents-in-Suit improved, *inter alia*, prior computer and networking technology, including in connection with:

a. Improving and increasing efficiencies of the claimed inventions, including over inferior alternative means for achieving the same or similar ends of uploading content, including by reducing or eliminating the cumbersome steps of previous methods of data transfer to the Internet and providing the ability to upload or transfer the captured data at a time subsequent to the capture of the data where a connection to the Internet may not be available to the data capture device. *See, e.g.*, '794/1:37-54 & 4:55-5:3.

b. Leveraging the capabilities of mobile devices, including their Internet connection capabilities (through use of custom hardware and/or software), including by shifting the transfer of data from the data capture device to the mobile device, to greatly enhance the functionality of Internet incapable data capture devices, including because the mobile device, with its larger storage, may then store the captured data for upload or transfer to the web service via the Internet at a later time. *See, e.g.*, '794/2:26-34, 5:18-56, 6:2-46, 9:37-60, & 10:10-61.

c. Uploading captured data from data capture devices to the Internet while avoiding the cost, memory usage, complexity, hardware (*e.g.*, cellular antenna), physical size, and battery consumption of an Internet accessible mobile device, including without the data capture device being capable of wireless Internet connections or being capable of communicating in Internet accessible protocols such as HTTP. *See, e.g.*, '794/2:46-54, 5:4-11, 5:55-6:8, 7:29-33, 7:62-67, 8:23-9:26.

d. Minimizing power usage by the data capture device, including to minimize the need to change batteries or recharge the device. *See, e.g.*, '794 at 4:66-5:1.

e. Using event notification, polling and request/return communication protocols over an already paired connection to have the benefits from an efficient or automated upload system while conserving resources such as batteries by avoiding the data capture device broadcasting captured data when an intermediate mobile device is unavailable (*e.g.*, off or out of Bluetooth range) or incapable of receiving captured data for uploading to the Internet. *See, e.g.*, '794/4:55-5:3 & 5:12-17.

    f.  Applying HTTP in transit and on an intermediary device. *See, e.g.*, '794/9:61-10:9.

20. The claimed inventions also provide computer and network efficiency at least because they allow data capture devices to have the useful and improved claimed sharing functionality without the need to include expensive and battery consuming electronics, cellular antenna, paying for separate cellular service, and extra software and data processing required on the data capture device. The inventors did more than simply apply current technology to an existing problem. Their invention, as embodied in the asserted claims, was a significant advancement in mobile data capture and sharing technology. The inventions covered by the asserted claims comprise utilization of the mobile Internet to create a novel architecture enabling data captured by non-Internet enabled capture devices to quickly, easily and automatically be uploaded to the Internet, and more specifically to what is referred to today as "the cloud" and "social media." Additionally, the claimed inventions also improve pairing identification, different ways to transfer of new-data between paired devices (event notification, polling, mobile initiated request response), and use of HTTP and adding user information to the wirelessly received new-data on the intermediary mobile device, when the new-data is in transit to the website.

21. These noted improvements over the prior art represent meaningful limitations and/or inventive concepts based upon the state of the art over a decade ago. Further, including in view of these specific improvements, the inventions of the asserted claims, when such claims are viewed as a whole and in ordered combination, are not routine, well-understood, conventional, generic, existing, commonly used, well known, previously known, typical, and the like over a decade ago, including because, until inventions of the asserted claims of the Patents-in-Suit, the claimed inventions were not existing or even considered in the field.

22. The asserted claims, including as a whole and where applicable in ordered combination, comprise, *inter alia*, a non-conventional and non-generic arrangement of communications between a data capture device and a Bluetooth enabled mobile device that is a technical improvement to the communications between the devices and web services,

including those improvements noted above.

23. The claimed inventions are necessarily rooted in computer technology, *i.e.*, portable monitoring device technology, and comprise improvement over prior technologies in order to overcome the problems, including those noted above, specifically arising in the realm of computer networks. The claimed solutions amount to an inventive concept for resolving the particular problems and inefficiencies noted above, including in connection publishing data from a data capture device to the Internet described.

## NIKE ACCUSED INSTRUMENTALITY

24. On information and belief, Nike practices, and/or induces others to practice, the claimed methods via its wearables that connect with Nike Apps, including but not limited too Adapt shoes and Adapt App work together to send non-native data from Nike's wearable shoes comprising the Nike Adapt iOS Mobile Application and Nike Adapt Android Mobile Application, and when used in conjunction with Nike's web services comprising www.nike.com. Some of the data Nike collects is used for increasing users' experience on not only this App but also on the Apps that Nike controls and directs in its digital platform for its more than 300 million Nike members.

25. These Nike Accused Instrumentalities do not include any devices that are accused of infringement in *Cellspin Soft, Inc. v. Nike, Inc*., Case No. 4:17-cv-05931-YGR (N.D. Cal. 2017). Instead, to avoid additional prejudice to Cellspin after waiting for four (4) years for a trial date on the merits, and still not having a trial date set in that district, and the Court ignoring that a search on Nike's own website, nike.com, for "Bluetooth" does not come up with any hits, not one hit, for the Accused Instrumentalities. Additionally, the Court agreed and quoted Nike verbatim, "discovery involving the Adapt products 'would entail a separate set of technical documents and information, different source code regarding those products and the related Adapt mobile app, and a new set of witnesses with knowledge regarding the technical issues related to the Adapt products and their related mobile app.'" *See id.,* Dkt. 172 at 3. That Court explained "this is not merely a matter of adding in a product, but a product that is distinct from and operates differently than the current accused devices." *Id*

(citing Nike).

26. That Court even commented that Nike would need a new claim construction hearing on the term 'data capture device' or 'destination web address'" alleged here was completely different and would require even a completely new claim construction ruling. *Id.* So although Nike contended that it did not infringe the prior Court's claim construction of these terms, it argued successfully to the Court and the Court agreed that in the interest of justice that Nike's Adapt products should not be included in that litigation. *See id.* at 4 ("'Nike's selection of claim terms for construction would have been substantially different and could have included terms, such as "data capture device" or "destination web address"' that Nike asserts the Adapt products do not meet.").

27. On information and belief, Nike's servers that interact with its Apps (Adapt, NTC and NRC and Nike App) are all based in the United States, including Texas.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,738,794

28. Plaintiff refers to and incorporates herein the allegations in the above paragraphs.

29. United States Patent No. 8,738,794 Patent was duly and legally issued by the USPTO on May 27, 2014 after full and fair examination. *See* Exhibit A.

30. Claims of the '794 Patent comprise, in general, methods comprising acquiring new data in a data capture device after establishing a paired connection with a mobile device; determining the existence of new data by the capture device; transferring the new data from the capture device to the mobile device automatically over the paired connection; receiving, at the mobile device, the new data from the data capture device; applying a user identifier uniquely identifying a particular user to the new data; transferring the new data along with the user identifier to a web service; receiving at the web service the new data and user identifier; and making available, at the web service, the new data received from the mobile device over the internet, wherein the new data corresponds to a particular user identifier.

31. Nike has infringed, and is now infringing, the '794 patent, including at least claims 1, 2, 3, 4, 7, and 9, in this judicial district, and elsewhere, in violation of 35 U.S.C. § 271, including subsection (f)(1) and/or (f)(2) through actions comprising the practicing, without

authority from Plaintiff, methods for acquiring and transferring data from Nike Bluetooth enabled data capture devices via its App to Nike web services via Bluetooth enabled computing devices.

32. Without limitation, the accused methods comprising Nike devices which practice said methods support Bluetooth protocols, including Bluetooth 4.0, which enables connection between such devices and other Bluetooth-enabled devices, such as a cell phone, tablet, laptop, or other computing device, and which permits the user to acquire and transfer data from Nike devices to the Nike web services via a Bluetooth enabled computing device. The accused Nike methods comprise acquiring and determining the existence of new tracking data, such as heart rate, steps, etc., in the Nike device after establishing a paired connection with the user's computing device, and transferring the new data from the Nike device to the user's computing device automatically over the paired connection. The accused Nike methods further comprise Nike applications on the user's computing device receiving the new data from the Nike device and transferring the new data, along with the user's account information identifying the user, and tied to the new data, to the Nike web service, such that the Nike web service receives, and makes available, the new data received from the user's computing device over the Internet. Upon information and belief, at least through Nike's efforts to test, demonstrate, and otherwise use Nike devices, Nike has practiced the accused Nike methods via at least the use of Nike devices, comprising at least establishing a Bluetooth paired connection to the Nike application, capturing new data at the Nike device, *e.g.*, heart rate or step counting data, and sending a notification along with the new data to the Nike application, wherein the Nike application sends the new data, along with a user identifier, to the Nike web service.

33. Additionally, or in the alternative, Nike has infringed, and now infringing, the '794 Patent in this judicial district, and elsewhere, including by jointly with its end users and/or customers, by and through the use of the Nike devices, applications, and web services noted above. Nike's infringement comprises joint performance of the claimed methods by Nike and/or its member comprising acquiring and transferring data from Nike Bluetooth enabled

data capture devices to Nike web services via Bluetooth enabled computing devices. Further, Nike conditions receipt of the benefits of the use of Nike's web services and applications, including storing user's data within Nike's web service and applications, upon performance by its customers and/or end users of one or more steps of the claimed methods. Nike further establishes at least the manner of the performance of these steps by its customers and/or end users as defined in Nike devices and applications, including that the customer and/or end user must create an account via the Nike web service, link the Nike device to the account, and sync the Nike device to the user's computing device and Nike application thereon, in order to receive the noted benefits.

34. Without limitation, Nike performs at least the steps comprising providing software modules on the Nike devices and the user's computing device, receiving at the Nike web services new data and the user's account information, and making available the new data for consumption over the internet. Further, Nike conditions the receipt of the above noted benefits upon its customers and/or end users performing at least the steps comprising establishing a connection between the Nike devices and the user's computing device, acquiring new data after the established connection, determining the existence of new data on the Nike device and sending a data signal to the Nike applications, wherein the signal comprises a portion of the new data, transferring the new data from the Nike device to the Nike applications, receiving the new data at the Nike applications, applying the user's account information to the new data, and transferring the new data, along with the user's account information, to the Nike web services.

35. Nike has had notice of its infringement of the '794 patent pursuant to notifications from Plaintiff comprising letters mailed on June 15, 2017 and August 31, 2017, and the lawsuit Nike has with Cellspin on Nike's other infringing devices that Nike told the Court work completely differently than the Accused Instrumentalities in this Court.

36. To the extent Nike continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '794 patent, such infringement is necessarily willful and deliberate. Plaintiff believes and contends that Nike's continuance of its clear and

inexcusable infringement of the '794 patent post notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

37. On account of the foregoing, Plaintiff contends such activities by Nike qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages. Including based on the foregoing, Plaintiff hereby respectfully requests an award of enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284 and 28 U.S.C. § 1927.

38. Each of Nike's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 8,892,752

39. Plaintiff refers to and incorporates herein the allegations in the above paragraphs.

40. U.S. Patent No. 8,892,752 was duly and legally issued by the USPTO on November 18, 2014 after full and fair examination. *See* Exhibit B.

41. Claims of the '752 Patent comprise, generally, methods comprising establishing a secure paired Bluetooth connection between a Bluetooth enabled data capture device and a Bluetooth enabled mobile device using an encryption key; acquiring new data in the capture device after the paired connection is established; receiving a message from the mobile device over the paired connection to enable event notification, corresponding to new data on the capture device; determining existence of the new data for transfer; sending an event notification to the mobile device, corresponding to existence of new data for transfer, over the paired connection, wherein the mobile device is configured to listen for the event notification; and transferring the encrypted data from the data capture device to the mobile device, over the paired connection, wherein the mobile device sends the obtained new data with an attached user identifier, a remote procedure call or hypertext transfer protocol method, and a destination web address to a remote internet server.

42. Nike has infringed, and is now infringing, the '752 patent, including at least claims 1, 2, 4, 5, 12, 13, and 14, in this judicial district, and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the practicing, without authority from Plaintiff, methods for

transferring data from Nike Bluetooth enabled data capture device to remote Nike internet servers via Bluetooth enabled computing devices. On information and belief, Nike practices, and/or induces others to practice, the claimed methods via its Accused Instrumentalities.

43. Without limitation, the accused methods comprising Nike devices which practice said methods support Bluetooth protocols, including Bluetooth 4.0, which enables connection between these devices and other Bluetooth-enabled devices, such as a cell phone, tablet, laptop, or other computing device, which permits the user to establish a secure connection between Nike devices and a user's computing device and acquire and transfer data from the Nike devices to the Nike web services via the user's computing device. The accused Nike methods comprise establishing a secure paired Bluetooth connection between the Nike device and the user's computing device using a Bluetooth encryption key. Once paired, new data is acquired on the Nike device, the Nike device receives a message from the user's computing device over the paired connection to enable event notifications which correspond to new data on the Nike device, the Nike device determines the existence of the new data for transfer, and the Nike device sends an event notification to the user's computing device over the paired connection, corresponding to existence of new data for transfer, wherein the user's computing device is configured to listen for the event notification. The encrypted data is transferred from the Nike device to the user's computing device over the paired connection, wherein the user's computing device sends the obtained new data along with the user's account information, a remote procedure call or hypertext transfer protocol operation, and a destination web address to a U.S. based Nike web server. Upon information and belief, at least through Nike's efforts to test, demonstrate, and otherwise use Nike devices, Nike has practiced the accused Nike methods via at least the use of Nike devices, comprising at least establishing a Bluetooth paired connection to the Nike application, capturing new data at the Nike device, *e.g.* motor temperature, lace tightness, battery life, and sending a notification along with the new data to the Nike application, wherein the Nike application sends the new data, along with a user's account information, to a Nike web address.

44. Nike has had notice of its infringement of the '752 patent pursuant to notifications

from Plaintiff comprising letters mailed on June 15, 2017 and August 31, 2017, and the above mentioned prior lawsuit of 4 (four) years brought by Cellspin against Nike.

45. Additionally, or in the alternative, Nike has induced, and continues to induce, infringement of the '752 Patent in this judicial district, and elsewhere, by intentionally inducing direct infringement of the '752 Patent, including by aiding or abetting infringement by its end users and/or customers, by and through at least use of the Nike products and applications noted above. Such aiding and abetting comprises providing products, devices, software, web services, and/or instructions regarding the use and/or operation of the Nike devices, applications, and web services in an infringing manner. Further, the direct infringement of Nike's members that occurs in connection with Nike's applications to Nike's web address occurs under the direction and control of Nike. Such induced infringement has occurred since Nike became aware of the '752 Patent, at a minimum, as noted above.

46. To the extent Nike continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '752 patent, such infringement is necessarily willful and deliberate. Plaintiff believes and contends that Nike's continuance of its clear and inexcusable infringement of the '752 patent post notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

47. On account of the foregoing, Plaintiff contends such activities by Nike qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages. Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

48. Each of Nike's aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT III – INFRINGEMENT OF U.S. PATENT NO. 9,749,847

49. Plaintiff refers to and incorporates herein the allegations in the above paragraphs.

50. U.S. Patent No. 9,749,847 was duly and legally issued by the USPTO on August 29, 2017 after full and fair examination. *See* Exhibit C.

51. Claims of the '847 Patent comprise, generally, systems comprising a capture device

comprising:  a communication device configured to establish a secure paired connection with a cellular phone, a processor configured to acquire new-data using a data capture circuitry after the paired connection is established coupled to a memory device, wherein said processor is configured to store the acquired new-data in the memory device and send an event notification along with the acquired new-data to the authenticated cellular phone over the established paired connection; and a mobile application comprising a graphical user interface (GUI) in the cellular phone configured to listen for and receive the event notification, receive the acquired new-data over the established paired connection, store the new-data in a memory device of the cellular phone before transfer to a website, and use HTTP to transfer the new-data, along with user information, to the website over a cellular data network.

52. Nike has infringed, and is now infringing, the '847 patent, including at least claims 1, 2, and 3, in this judicial district, and elsewhere, in violation of 35 U.S.C. § 271 through actions comprising the making, using, offering for sale, and/or selling, without authority from Plaintiff, systems for transferring data from Nike Bluetooth enabled data capture devices to Nike websites via Bluetooth enabled cellular phones. On information and belief, Nike makes, uses, offers for sale, and/or sells, and/or induces others to use, the claimed systems.

53. Without limitation, the accused Nike devices support Bluetooth protocols, including Bluetooth 4.0, which enables connection between such devices and other Bluetooth-enabled devices, such as a cellular phone, which permits the user member to establish a secure connection between the Nike devices and a user's computing device and acquire and transfer data from the Nike devices to the Nike web services via the user's computing device. These Nike devices comprise capture devices, comprising a communication device within the Nike devices configured to establish a secure paired connection with a user's cellular phone, a processor configured to acquire new-data on the Nike device, *e.g.*, heart rate or step tracking data, using data capture circuitry within the Nike devices after the paired connection is established. The processor within the Nike devices is coupled to a memory device within

said devices, wherein said processor is configured to store the acquired new-data in the memory device and send an event notification, along with the acquired new-data, to the user's authenticated and paired cellular phone over the established paired connection. The Nike application comprises a graphical user interface (GUI) for operation on the user's cellular phone, and the Nike application is configured to listen for and receive the event notification from the Nike devices, receive the acquired new-data over the established paired connection from the Nike devices, store the new-data in a memory device of the user's cellular phone before transfer to the Nike websites, and use HTTP to transfer the new-data, along with the user's account information, to the Nike websites over a cellular data network, such as the user's cellular network. In addition, and in the alternative, to Nike's making, offering for sale, and/or selling of the Nike devices and applications, upon information and belief, at least through Nike's efforts to test, demonstrate, and otherwise use Nike devices, Nike has used the claimed systems via at least the use of the Nike devices, comprising at least establishing a Bluetooth paired connection to the Nike application, capturing new data at the Nike device, *e.g.*, heart rate or step counting data, and sending a notification, along with the new data, to the Nike application, wherein the Nike application sends the new data, along with a user's account information, to the Nike website.

54. Nike has had notice of its infringement of the '847 patent pursuant to notification from Plaintiff comprising a letter mailed on August 31, 2017, and the on-going lawsuit among the parties.

55. Additionally, or in the alternative, Nike has induced, and continues to induce, infringement of the '847 Patent in this judicial district, and elsewhere, by intentionally inducing direct infringement of the '847 Patent, including by aiding or abetting infringement by its end users and/or customers, by and through at least Nike's making, offering for sale, and/or selling, without authority from Plaintiff, the Nike devices and applications noted above. Such aiding and abetting comprises providing products, devices, hardware, software, websites, and/or instructions, including providing the accused Nike devices and applications to customers and/or end users who, in turn, use the claimed systems, including as noted

above. Such induced infringement has occurred since Nike became aware of the '847 Patent, at a minimum, as noted above.

56. To the extent Nike continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '847 patent, such infringement is necessarily willful and deliberate. Plaintiff believes and contends that Nike's continuance of its clear and inexcusable infringement of the '847 patent post notice is willful, wanton, malicious, bad-faith, deliberate, and/or consciously wrongful.

57. On account of the foregoing, Plaintiff contends such activities by Nike qualify this as an egregious case of misconduct beyond typical infringement, entitling Plaintiff to enhanced damages. Including based on the foregoing, Plaintiff requests an award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284.

58. Each of Nike's aforesaid activities have been without authority and/or license from Plaintiff.

## DAMAGES

59. By way of its infringing activities, Nike has caused, and continues to cause, Plaintiff to suffer damages, and Plaintiff is entitled to recover from Nike the damages sustained by Plaintiff as a result of Nike's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

60. Nike's infringement of Plaintiff's rights under the patents-in-suit will continue to damage Plaintiff, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

61. Plaintiff also requests that the Court make a finding that this is an exceptional case entitling Plaintiff to recover their attorneys' fees and costs pursuant to 35 U.S.C. § 285.

## JURY DEMAND

62. Plaintiff hereby requests a trial by jury including pursuant to Rule 38 of the Federal Rules of Civil Procedure on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff hereby respectfully requests that this Court enter judgment in favor of Plaintiff and against Nike, and that the Court grant Plaintiff the following relief:

A. An adjudication that one or more claims of the patents-in-suit has been directly and/or indirectly infringed by Nike;

B. An award to Plaintiff of damages adequate to compensate Plaintiff for Nike's past infringement, together with pre-judgment and post-judgment interest, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses, and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C. A grant of preliminary and permanent injunction pursuant to 35 U.S.C. § 283, enjoining Nike and all persons, including its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation therewith, from making, using, offering to sell, or selling in the United States or importing into the United States any methods, systems, or computer readable media that directly or indirectly infringe any claim of the patents-in-suit, or any methods, systems, or computer readable media that are colorably different;

D. That this Court declare that Nike's infringement has been, and continues to be, willful, including that Nike acted to infringe the patents-in-suit despite an objectively high likelihood that its actions constituted infringement of a valid patent and, accordingly, award enhanced damages, including treble damages, pursuant to 35 U.S.C. § 284;

E. That this Court declare this to be an exceptional case and award Plaintiff reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

F. A judgment and order requiring Nike to pay Plaintiff their damages, costs, expenses, fees, and prejudgment and post-judgment interest for Nike's infringement of the patents-in-suit as provided under 35 U.S.C. §§ 284 (including global sales under § 271(f)(2) and/or 285; and

G. Any and all further relief for which Plaintiff may show itself justly entitled that this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby respectfully requests a trial by jury of any issues so triable by right.

Dated:  August 3, 2021                    Respectfully Submitted

*/s/ Randall Garteiser*
Randall Garteiser
Texas Bar No. 24038912
rgarteiser@ghiplaw.com
René A. Vazquez
Virginia Bar No. 41988
rvazquez@ghiplaw.com
M. Scott Fuller
Texas Bar No. 24036607
sfuller@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (903) 284-5200

**ATTORNEYS FOR**
**CELLSPIN SOFT, INC.**

ORIGINAL COMPLAINT FOR INFRINGEMENT OF U.S. PATENT NOS. 8,738,794, 8,892,752, AND 9,749,847]